UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| BATTELLE ENERGY ALLIANCE, LLC, a Delaware limited liability company,<br><br>    Plaintiffs,<br><br>  v.<br><br>SOUTHFORK SECURITY, INC., an Idaho corporation, COREY THUEN, an individual, and DOES 1 through 10, inclusive,<br><br>    Defendants. | Case No. 4:13-cv-00442-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

On October 15, 2013, this Court granted plaintiff Battelle Energy Alliance, LLC's *ex parte* application for a temporary restraining order.  *See* Dkt. 8.  The restraining order prevented defendants from releasing a computer software product known as Visdom (which Battelle claims is a copy of its product, Sophia) as an open-source product.  It also required defendants to deliver defendants' computer hard drive to defendants for imaging.

After receiving notice of the order, defendants informed the Court and Battelle

that they had released Visdom as an open-source product over three months ago – in July

2013.  Based on this new information, Battelle now asks the Court to order defendants to

remove Visdom's source code from the internet repository where it is currently posted.  It

also asks the Court to continue the terms of the Court's October 15 temporary restraining

order.

The Court heard argument on Battelle's request for a preliminary injunction on

October 23, 2013, and the parties submitted supplemental briefing on October 25, 2013.

The Court now issues its ruling.  For the reasons explained below, the Court will deny the

requested preliminary injunction because Battelle has failed to demonstrate that, absent

an injunction, it is likely to suffer immediate, irreparable injury.

## BACKGROUND

The Idaho National Laboratory is a federal government facility owned by the

United States Department of Energy.  Plaintiff Battelle is the lab's management and

operating contractor.  Battelle's work at the lab includes performing federally funded

research projects.

In 2009, the Department of Energy commissioned Battelle to research and develop

a computer program aimed at protecting the United States' critical energy infrastructure

(oil, gas, chemical and electrical companies) from cyber-attacks.  Defendant Corey Thuen

is a former Battelle employee who helped develop this computer program during his

tenure at Battelle.[1]  The program ultimately became known as Sophia. The name Sophia was chosen as a reference to the Greek goddess of wisdom.

Battelle tested Sophia in 2012 and learned that electric utility companies were interested in a commercial version of the software program. These companies, however, said they did not want an "open source" version of the software, which means that the source code would be available to the public.  Instead, they wanted a closed-loop proprietary version of the software.  *See Kaczor Dec.*, Dkt. 2-4, ¶ 16.

Battelle is not able to commercialize its research products and inventions.  Instead, the lab licenses its technologies to third parties who market and sell them. Thus, as Sophia neared completion, Battelle began a bidding process, which allowed commercial software and network security firms to compete for the right to exclusively license Sophia.

In 2012, Thuen became interested in creating a spin-off company for the purpose of bidding on the Sophia licensing project. Because Thuen was interested in licensing Sophia, Battelle removed him from the Sophia project in August 2012 and revoked his access to Sophia files. Still, Thuen remained employed at Battelle, working on other projects.  *Oct. 22, 2013 Thuen Dec.,* Dkt. 16-1, ¶ 11

Roughly five months later, in February 2013, Thuen began a one-year unpaid professional leave of absence from Battelle.  *Id.* ¶ 12.  The terms of his leave, which are discussed more fully below, obligated Thuen to seek permission from Battelle if he

---

[1] More specific facts related to Thuen's employment with Battelle, including the terms of his employment agreement, are laid out below, in connection with the Court's analysis of Battelle's contract claims.

wanted to perform any outside activity other than forming a spinoff company which would have the "single purpose of pursuing the commercialization license of Sophia." *See Pickett Dec.,* Dkt. 28-2, Exs. A and B thereto.

On February 28, 2013 – the very beginning of Thuen's professional leave of absence – defendant Southfork, which was created for the purpose of bidding on Sophia, submitted a licensing proposal for Sophia.  *Stmt. of Facts* ¶ 42.  Thuen also says that "around" the next day, March 1, 2013, he began writing Visdom with co-developer Kristopher Watts.  *Id.* ¶ 14.  (Watts later took a job with Battelle.)  Roughly six weeks later, on April 18, 2013, Southfork abruptly withdrew from the competitive business process to license Sophia.  Then, on May 1, 2013, Southfork began promoting Visdom on its website.  *Id.* ¶ 44.  Meanwhile, Battelle awarded another company, NexDefense, the right to negotiate an exclusive commercial license for Sophia. *See Stmt. of Fact*s, Dkt. 2-2, ¶ 22.

Battelle terminated Thuen on June 27 or 28, 2013.  A few weeks later, on July 18, 2013, Thuen placed Visdom's source code on github.com.  Thuen says github.com is well known among computer programmers and is among the most popular internet repositories for open-source software.  *Id.*

In October 2013, Battelle sued Thuen and Southfork, alleging eight claims:  (1) copyright infringement; (2) trade secret misappropriation; (3) breach of contract; (4) tortious interference with prospective economic advantage; (5) unfair competition; (6) conversion; (7) breach of the implied covenant of good faith and fair dealing; and (8)

unjust enrichment.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). To making this showing, the moving party must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in favor of the moving party; and (4) that an injunction is in the public interest. *Id.* The requirements are stated in the conjunctive so that all four elements must be established to justify injunctive relief. The court may apply a sliding scale test, under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

An even more stringent standard is applied where mandatory, as opposed to prohibitory, preliminary relief is sought. Prohibitory injunctions restrain a party from taking action and effectively "freeze[] the positions of the parties until the court can hear the case on the merits." *Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983). Mandatory injunctions go well beyond preserving the status quo, as they order a party to take some action. *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009). The Ninth Circuit has noted that although the same general principles inform the court's analysis in deciding whether to issue mandatory or

prohibitory relief, courts should be "extremely cautious" about ordering mandatory relief. *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 675 (9th Cir.1984).  Mandatory preliminary relief should not issue unless both the facts and the law clearly favor the moving party and extreme or very serious damage will result.  *See Marlyn Nutraceuticals,* 571 F.3d at 879.  Mandatory injunctions are not issued in doubtful cases, or where the party seeking an injunction could be compensated in damages.  *Id.*

The Court agrees with defendants that Battelle seeks mandatory relief.  The defendants released Visdom as an open-source product three months before this lawsuit was filed.  Thus, as of October 15, 2013, when Battelle sued, the status quo was that Visdom was available to the public.  *See, e.g., Marlyn Nutraceuticals*, 571 F.3d at 879 (the status quo is the "last, uncontested status which preceded the pending controversy") (quotation marks and citations omitted).  Battelle is not seeking to freeze that particular state of affairs.  It wants defendants to do something that will change the status quo – namely, to remove Visdom's source code from the internet.  Battelle must therefore satisfy the more stringent test applicable to mandatory relief.

## ANALYSIS

**A**.      **Likelihood of Success on the Merits**

As noted, Battelle alleges eight claims against Battelle.  As these injunction proceedings developed, however, the parties devoted the majority of their time and attention to the copyright infringement claim and the contract claims.  The parties' analysis of the other claims largely derives from their analysis of these claims.  At this

preliminary stage then, and given the expedited time frame in which these motions are being briefed and decided, the Court will restrict its analysis to the copyright and contract claims.  Further, the Court has concluded that regardless of which claim is analyzed, Battelle has failed to show that it is immediately threatened with any irreparable harm, which precludes entry of preliminary injunctive relief.

> ### 1.    Contract Claims

Battelle is likely to succeed on its contract claims, including its third claim for breach of contract and its seventh claim for breach of the implied covenant of good faith and fair dealing.

Thuen began working for Battelle in May 2009.  He signed an employment agreement, which obligated him to "promptly and fully" disclose "all Innovations and/or Work for Hire" including computer programs that he authored alone or jointly with others "during the period of his employment."  *May 28, 2009 Employment Agmt., Ex. A to Colson Aff.,* Dkt. 2-3, ¶ 7.  He agreed that any such Innovations and Works for Hire were Battelle's "sole and exclusive property" and "assign[ed] to BEA all of [his] right, title, and interest therein."  *Id.* As a result, if Battelle can prove Visdom is an "innovation" or a "work for hire" that Thuen created by himself, or jointly with someone else, during his "period of employment" with Battelle, then Battelle will prevail on its contract claim.

Battelle should be able to make these showings.  First, it seems relatively clear that Visdom is a computer program "along the lines of or relat[ing] to the business, work, or

investigations of Battelle." *Id.* ¶ 7.  There is no question that Visdom is intended to solve the same problems as Sophia.  *See Thuen Dec.,* Dkt. 16-1, ¶ 18 ("Visdom is intended to solve the same problems as Sophia, but it is not a copy of Sophia, . . . .").  At this stage in the litigation, the Court is not persuaded by defendants' arguments that the terms of the employment agreement are ambiguous or conflicting on this point.

The more complex question is whether Visdom was created "during the period of" Thuen's employment.  Thuen testified that he and Kristopher Watts developed Visdom "in a matter of several months," beginning "on or about March 1, 2013."  *See Thuen Decl,* Dkt. 16-1, ¶¶ 14, 19.  (As already noted, Visdom's source code was posted on github.com on July 18, 2013.)  Thuen was on unpaid administrative leave from Battelle during most of this time, as he began his unpaid leave on or about February 25 and was not terminated until around June 27, 2013.  *Id.* ¶¶ 12-13.

So the issue is whether an employee who is on an unpaid, professional leave of absence is still serving a "period of employment" with the company.  The evidence in this case strongly suggests Thuen remained as a Battelle employee during his leave of absence.

Battelle allows employees who wish to "pursue outside spin-off activities" to choose between terminating their employment or taking a professional leave of absence. *See Pickett Dec.*, Dkt. 28, ¶ 9.  Those who choose a professional leave can retain key benefits.  For example, they can keep their medical insurance, dental insurance, flexible spending accounts and life insurance.  Additionally, the time spent on leave counts as

service with Battelle for purposes of calculating retirement benefits, vacation and sick time and severance pay in the event of a layoff.  *Id.* ¶ 10.

Faced with these options, Thuen chose to go on leave, thus retaining many of the benefits described above.  This alone suggests Thuen created Visdom "during the period of his employment" with Battelle.  But perhaps even more compelling is the paperwork the parties completed in contemplation of Thuen's leave.

In January 2012 – more than a year before he went on leave – Thuen and four other Sophia developers expressed interest in creating a spin-off company to commercialize Sophia.  They indicated that the spin-off company would have "the single purpose of pursuing the commercialization of Sophia."  *Conflict of Interest Form, Ex. B to Pickett Dec.,* Dkt. 28-2 at 2.  They further stated that "[o]ur spin-out company will not pursue revenue sources or other business opportunities until a decision has been made on the commercialization license of Sophia."  *Id.*  So things were relatively clear:  while he was on leave, Thuen could perform one specific "outside activity" – create a company that would seek to commercially license Sophia.[2]

When Battelle approved this "outside activity" in February 2013 – right at the time Thuen began his leave – it limited Thuen to this activity, expressly stating that if Thuen intended to do something different, he would need to advise the company and get a new approval.  Specifically, in its approval, Battelle stated:

---

[2] Originally, the other Sophia developers planned to create the spin-out company with Thuen. They lost interest, however, so Thuen pursued the opportunity on his own.

The full-time outside activity you proposed on your forms 480.05 and 480.06 does not appear likely to conflict with your work at the INL or with BEA's activities in general.  If that situation changes, however, you will need to advise HR and the Conflict of Interest Office for a reevaluation of the approval. This approval applies only to your proposed professional leave of absence to work at Southfork Security, Inc. *If you propose to perform any other outside activity, you must submit a separate INL Request for Approval of Outside Activities and Disclosure of Potential Conflict of Interest (COI), Form 480.05. Also, if your involvement grows beyond the currently approved activity into any other relationship that would either cause or appear to cause a conflict of interest, you will need to submit a separate request form.*

*Ex. I to Colson Aff.*, Dkt. 2-3 (emphasis added).  On February 27, 2013, Thuen agreed to these conditions.  In his own words:  "I confirm that I understand and will comply with the conditions . . . and that I will submit new Approval of Outside Activities forms as things change." *Id.*

Given all this evidence, it seems likely that Thuen created Visdom "during his employment" with Battelle – even if he was on leave.  Thus, Battelle should be able to prove that Thuen breached his contract with Battelle by failing to disclose Visdom to Battelle and by failing to assign his rights in Visdom to Battelle.  For the same reasons, Battelle should be able to succeed on its claim for breach of the implied covenant of good faith and fair dealing.

The Court has considered defendants' various arguments to the contrary but finds them unpersuasive.

Defendants first contend that Battelle's existing complaint does not encompass this particular breach of contract.  They also say that Battelle did not point out these

breaches until the October 23, 2013 oral argument.  The complaint, however, alleges that Thuen breached the terms of his employment agreement with Battelle, as contained in various documents including his employment agreement and his conflict-of-interest plans.  *See* Cmplt., Dkt. 1, ¶¶ 87-90.  Further, Battelle's initial memorandum supporting its claim for injunctive relief argued that Thuen was required to disclose innovations arising out of his work for Battelle.  *App. Mem.,* Dkt. 2-1, at 9.  Granted, Battelle focused more time and attention on its copyright claim in its initial briefing.  Nonetheless, defendants were adequately notified that Battelle was seeking an injunction based on alleged breaches of contract and, further, after the hearing, they were given the opportunity to submit supplemental briefing on this point.

Defendants also say Visdom is actually two separate works – one authored by Kristopher Watts and one authored by Thuen.  But these works together create Visdom, and Thuen's contract obligates him to disclose and assign innovations and works for hire that he created by himself or "jointly with others."  *May 9, 2009 Employment Agmt.,* Dkt. 2-3, ¶ 7.

Defendants also contend that Battelle's contract claim is barred by the doctrine of laches.  They point out that Battelle learned Southfork was promoting Visdom on its website in May 2013, but did nothing until October 2013.  While the Court is persuaded that this five-month delay seriously undermines Battelle's claimed need for immediate injunctive relief, the Court cannot make the much larger finding that Battelle's contract claims are entirely barred due to laches.

Whether or not a party is guilty of laches is a question of fact.  *Huppert v. Wolford*, 420 P.2d 11, 18 (Idaho 1966). The necessary elements to maintain a defense of laches are: "(1) defendant's invasion of plaintiff's rights; (2) delay in asserting plaintiff's rights, the plaintiff having had notice and an opportunity to institute a suit; (3) lack of knowledge by the defendant that plaintiff would assert his rights; and (4) injury or prejudice to the defendant in the event relief is accorded to plaintiff or the suit is not held to be barred."  *Henderson v. Smith*, 915 P.2d 6, 11 (Idaho 1996).  Because the doctrine of laches is founded in equity, in determining whether the doctrine applies, consideration must be given to all surrounding circumstances and acts of the parties. *Id.* The lapse of time alone is not controlling. *Id.*

Here, after considering all the surrounding circumstances and the acts of the parties, as detailed above, on this record, the Court cannot find that doctrine of laches would bar Battelle's contract claims.

### 2.    Copyright Infringement

The Court granted Battelle's application for a restraining order on the strength of its copyright infringement claim.  As the parties are aware, however, that order was granted without notice to the defendants.  Now, after considering defendants' evidence and argument, the Court finds the record inconclusive as to the copyright infringement claim.  More specifically, the Court cannot tell whether defendants copied Sophia's source code when they created Visdom.  Thus, it cannot conclude that Battelle will likely

succeed on the merits of its copyright infringement claim.

As previously explained, to succeed on its copyright infringement claim, Battelle must show (1) ownership of a valid copyright and (2) unauthorized copying of constituent elements of the copyrighted work that are original. *Feist Pub'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Defendants do not dispute the first element (ownership of a valid copyright), but say Battelle will not be able to prove the second – copying.

Battelle can prove copying by either direct or circumstantial evidence. At this point, there is no evidence of direct copying. To prove copying via circumstantial evidence, Battelle must show that Visdom is substantially similar to Sophia and that defendants had access to Sophia. *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006).

To prove "substantial similarity," Battelle now relies on Shad Staples' declaration. *See* Dkt. 23. The problem with Staples' testimony is that it is so preliminary and inconclusive.[3] His declaration is filled with disclaimers like these:

- "Additional time and analysis would be needed to provide more in-depth analysis as well as additional examples"

- "Although I have not had an opportunity to complete my analysis, . . . ."

---

[3] The Court does not mean to be unduly critical of Staples. It appears as though he had just a few days to complete his analysis. He received a copy of Visdom on Thursday, October 17, 2013 and signed his declaration on Tuesday, October 22, 2013. It took Battelle roughly three years to develop Sophia and defendants say it took them several months to develop Visdom.

- "Overall, the two code bases [of Visdom and Sophia] are written in different programming languages, and therefore, cannot be identical, but may be functionally similar."

*Staples Dec.*, Dkt. 23, ¶¶ 5, 10

In addition to these disclaimers, Staples concedes that parts of Sophia and Visdom differ.  He says that the "interface" – or, what the parties describe as the front end of the two programs – are different.  *See Staples Dec.* ¶ 7.  Additionally, the two programs were written in different languages.  Thuen, for his part, says programmers cannot simply cut language from one computer program and then paste it into another.  Staples responds by saying that although Sophia and Visdom are written in different languages, they are still "similar not only in some of the details of the code but in what they are trying to accomplish and the way they accomplish it."  *Staples Dec.* ¶ 9.

Of course, if the two programs are simply attempting to accomplish the same function, one will not infringe the other.  As one court has explained, "Google – and everyone else in the world – was and remains free to write its own code to carry out the identical function so long as the implementing code in the method body is different from the copyrighted implementation."  *Oracle Am., Inc. v. Google, Inc.*, 872 F. Supp. 2d 974, 997 (N.D. Cal. 2012).  As for the similarities in the code language, the one specific example Staples provides is not enough to convince the Court that Battelle will likely succeed on the merits of its copyright infringement claim – particularly when he repeatedly cautions that his analysis is preliminary.

**B.**     **Irreparable Harm**

To obtain a preliminary injunction, Battelle must demonstrate that irreparable

injury is *likely* – not merely possible – in the absence of an injunction.  *Winter,* 555 U.S.

at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is

inconsistent with our characterization of injunctive relief as an extraordinary remedy that

may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").

Further, the threat of irreparable harm must be immediate.  *Caribbean Marine Servs. Co.*

*v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).  Harm is irreparable when, as name

suggests, the harm cannot be undone by an award of compensatory damages.  *See id.*

The threat of loss of prospective customers, goodwill, or reputation may support a

finding of irreparable harm, so long as it is not too speculative.  *Rent-A-Center, Inc. v.*

*Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (noting

that damage to the reputation or goodwill, because it is difficult to calculate, qualifies as

irreparable harm).  Damages to goodwill and reputation have typically supported findings

of irreparable harm only where evidence clearly supports such damage.  *Goldie's*

*Bookstore v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984) (rejecting plaintiff's

claim of loss of goodwill and "untold" customers as too speculative).

Additionally, irreparable harm may arise when a company loses prospective

goodwill due to the lost ability to market a unique product.  *See, e.g., Tom Doherty*

*Assocs., Inc. v. Saban Entm't, Inc.,* 60 F.3d 27, 38 (2d Cir. 1995) ("Although we hold that

a loss of prospective goodwill can constitute irreparable harm, we also hold that there

must be a clear showing that a product that a plaintiff has not yet marketed is a truly unique opportunity for a company. New products as yet unmarketed by anyone would simply not qualify.").

The Court will discuss the specific alleged irreparable harms below. Preliminarily, though, the Court observes that the threat of *immediate* harm is doubtful for at least two reasons.

### 1. Immediacy

First, the fact that Visdom has been publicly available since July 2013 undermines Battelle's irreparable-harm argument.  Battelle initially argued that irreparable harm would immediately befall it if defendants publicly released Visdom's source.  It also said that once this harm was done, it could not be undone.  *App. Mem.*, Dkt. 2-1, at 14. Shortly after bringing its *ex parte* application for injunctive relief, however, Battelle learned that the facts were different than what it had assumed – Visdom had been released as an open-source product back in July 2013.  Battelle has not adequately explained how the July 2013 release impacted Battelle or why injunctive relief is still needed or whether it would be effective at this point.

Second, Battelle delayed seeking any form of injunctive relief for five months.  In May 2013, Battelle discovered that Southfork was promoting Visdom on its website.  *See Colson Aff.* ¶ 27.  The website's written description of Visdom was substantially identical to defendant Thuen's earlier description of Sophia.  *See id.* ¶ 28.  Battelle has not explained why it waited until October 2013 to seek relief.  "Although delay by itself is

not a determinative factor in whether the grant of interim relief is just and proper," the delay is "nonetheless relevant in determining whether relief is truly necessary." *Miller v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir.1993); *see also Dahl v. Swift Distrib., Inc.*, 2010 WL 1458957, at *3 (C.D. Cal. Apr. 1, 2010) ("unexplained delay in seeking 'emergency' injunctive relief undercuts a claim that an injunction is necessary to prevent immediate and irreparable injury").

### 2. The Alleged Harms

Battelle says there are two categories of irreparable harm at issue: (1) the risk to nation's energy infrastructure; and (2) market-based injuries.

***The Alleged Threat to National Security.*** As for the national security threat, the Court finds that this is a rare case where it is appropriate to consider the public's interest within the irreparable-harm calculus. *See Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618 (5th Cir. 1985) (irreparable harm was adverse impact overcharges would have on public; the court thus concluded that "the irreparable harm and the public interest inquiries are intertwined, and we consider them jointly"). Still, though, the Court cannot conclude that a threat to our national security is imminent.

The parties disagree as to whether keeping a computer program's source code enhances security. Defendants say that the entire national-security argument is nothing more than a scare tactic. More specifically, they say that the open-source computer software models are widely used in secure systems and, further, that the closed-source model is regarded as misguided. *See Thuen's Third Dec.* ¶ 4. Battelle, on the other hand,

says that the "public release of software source code exposes individual and infrastructure behind the software to risk from those with malicious intent." *Seideman's Second Dec.* ¶ 2.

Regardless of which party is correct, at this point, there is no evidence that either Visdom or Sophia are being used to protect any part of the nation's energy infrastructure. So the Court cannot find that there is an *imminent* threat to national security. Additionally, on the current record, the Court cannot conclude that Sophia's and Visdom's source codes are "substantially similar," which undermines the argument that revealing Visdom's source code to the public has, at the same time, revealed Sophia's source code to the public.

In short, then, the Court is not persuaded – at this stage, at least – that the release of Visdom will imminently threaten national security. Rather, as discussed below, the more relevant discussion at this point is whether Battelle will suffer some form of market-based irreparable injury if Visdom's source code remains publicly available.

***Market-Based Injuries***.  Battelle's central, market-based argument is that releasing Visdom's source code will obliterate its ability to develop a market for Sophia. As Battelle explains, if Visdom's source code is freely available, Battelle would be thrust into the same position as someone who wanted to sell rights to a Google-like search engine when potential customers could use Google for free.  *See Kaczor Dec.* ¶ 32.  A major premise of Battelle's argument is that Visdom's and Sophia's source codes are substantially similar.  That is, Battelle says that potential licensees of Sophia want the

product to be a closed-loop, proprietary software.  The logical implication, then, is that these same potential customers would not be interested in Sophia if Sophia's source code was publicly available.  And therein lies Battelle's problem.  On the current record, the Court cannot conclude that Sophia's and Visdom's source codes are substantially similar.  Thus, the Court cannot conclude that releasing Visdom's source code will obliterate Battelle's ability to develop and license Sophia.

## C.      Balance of Hardships

Having concluded that Battelle has not shown a probability that it will suffer irreparable harm in the absence of an injunction, it is unnecessary to determine whether the balance of hardships tips in Battelle's favor.  *See generally Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 764 (2d Cir. 1979) ("Having already held that [plaintiff] has failed to prove a probability of irreparable damage . . . there is little to add on the subject of the balance of hardships.").  Still, though, the Court is cognizant of the potential harms Battelle may suffer.  If Visdom is ultimately found to be a copy of Sophia, then allowing that source code to remain publicly available could profoundly harm Battelle.  After all, as the parties seem to acknowledge, allowing a closed-loop, proprietary computer program out into the public cannot be undone.  Forcing defendants to keep Visdom's source code secret until trial, on the other hand, would be far less injurious.

A key problem Battelle faces, however, is that it sat on its hands in such a way that the Court cannot find that irreparable harm is immediately threatened.  Additionally, as

noted above, the Court is not in a position – at this stage – to conclude that Battelle will likely succeed on the merits of its copyright infringement claim.

Given the potential for harm to Battelle, however, the Court finds it appropriate to expedite the discovery and trial of this matter.  During the hearing, defense counsel indicated he was amenable to an expediting this matter.  Thus, as set out more specifically below, the Court will order the parties to come up with a litigation plan – including focused, streamlined, and limited discovery efforts – that will allow this matter to be tried within six months from the date the complaint was filed.

**D.    Public Interest**

As noted, the Court considered the public-interest factor jointly with the irreparable harm factor.  In particular, in discussing the public-interest prong, the parties have focused on a potential threat to the security of our nation's energy infrastructure. The Court does believe there is a potential national security risk in this case, but the scope and extent of that risk has not been so clearly developed that the Court can justify the injunctive relief Battelle requests.  However, the national security risk may clearly be an issue at trial and the Court may then be persuaded that national security is an issue which supports the issuance of a permanent mandatory injunction.

## ORDER

### IT IS ORDERED THAT:

1.      Battelle's request for preliminary injunctive relief (Dkt. 2) is **DENIED** without prejudice.  Battelle may renew its motion during the pendency of this action to

present new or different facts indicating a need for preliminary injunctive relief.

2. The Temporary Restraining Order entered on October 15, 2013 (Dkt. 8) is dissolved to the extent defendants were restrained from posting Visdom's source code on the internet. The Court will, however, continue to retain the images of defendants' computer hard drives during the pendency of this action, pending further input from the parties.

3. The Court will expedite the trial of this matter. Within seven days of this Order, the parties are ordered to meet and confer to develop a comprehensive litigation plan under Federal Rule of Civil Procedure 26(f) and a fast track case management plan under Rule 16 that would allow this case to proceed to trial within six months of the date the complaint was filed. The parties shall also be prepared to meet with the Court within two weeks of this Order to develop a case management order that incorporates these plans. An order scheduling this meeting will be forthcoming.

DATED: October 29, 2013

B. Lynn Winmill
Chief Judge
United States District Court