UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| BATTELLE ENERGY ALLIANCE, LLC, a Delaware limited liability company,<br><br>    Plaintiffs,<br><br>  v.<br><br>SOUTHFORK SECURITY, INC., an Idaho corporation, COREY THUEN, an individual, and DOES 1 through 10, inclusive,<br><br>    Defendants. | Case No. 4:13-cv-00442-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

In October 2013, this Court denied plaintiff Battelle Energy Alliance, LLC's request for a preliminary injunction. *See* Dkt. 31. The Court found that although Battelle had shown it was likely to succeed on the merits of its contract claims, it had failed to demonstrate a likelihood of immediate, irreparable injury. Battelle now moves for summary judgment on its contract claims, and it asks for a permanent injunction as well. *See* Dkt. 41.

The Court scheduled oral argument for February 21, 2014, but defense counsel failed to appear.  The Court allowed plaintiff to submit a supplemental brief, outlining the points it had intended to raise during oral argument.[1]  Briefing is complete, and the Court will issue its decision.  For the reasons explained below, the Court will deny Battelle's motion for summary judgment.

## FACTS

The Idaho National Laboratory is a federal government facility owned by the United States Department of Energy.  Plaintiff Battelle is the lab's management and operating contractor.  Battelle's work at the lab includes performing federally funded research projects.

In 2009, the Department of Energy commissioned Battelle to research and develop a computer program aimed at protecting the United States' critical energy infrastructure (oil, gas, chemical and electrical companies) from cyber attacks.  Defendant Corey Thuen is a former Battelle employee who helped develop this program, which eventually became known as Sophia.

In 2013, almost four years after he began working for Battelle, Thuen took an

---

[1] After the Court had already prepared a draft decision, defendants asked for an opportunity to submit a supplemental brief.  *See Mar. 6, 2014 Motion for Leave to File Response,* Dkt. 53.  The Court will deny this motion.  Therefore, in deciding the pending motion for summary judgment, the Court will not consider the supplemental brief defendants submitted.  Among other things, defendants did not submit this memorandum until nearly two weeks after their counsel failed to appear at the scheduled February 21, 2014 hearing on Battelle's motion for summary judgment. By that time, the Court had already prepared a draft decision denying the motion.  Additionally, defendants should not be allowed to have the last word on the motion for summary judgment after having failed to appear at the hearing.  The Court will not impose sanctions for defendants' belated effort to file a supplemental brief.  The Court will not, however, preclude Battelle from seeking sanctions related to defense counsel's failure to appear at the February 21, 2014 hearing.

unpaid leave of absence from Battelle.  Initially, Thuen was interested in taking a leave so he could form a spin-out company, which would license Sophia to third parties. Battelle supported this idea because the company does not have the capability to commercialize its research product and inventions; rather, the lab licenses its technologies to third parties who market and sell them.  During his leave, Thuen's plans changed.  He initially pursued the Sophia license but then withdrew his bid for the license and began marketing Visdom, which is a software product intended to compete with Sophia.  Thuen says he created Visdom while on leave.  Battelle says it owns Visdom by virtue of Thuen's written employment agreement.

## 1.    Thuen's Employment Agreement

Thuen signed his employment agreement in May 2009.  It obligates him to "promptly and fully" disclose "all Innovations and/or Work for Hire" including computer programs that he authored alone or jointly with others "during the period of . . . [his] employment."  *May 28, 2009 Employment Agmt.,* Dkt. 2-3, ¶ 7.  Thuen further agreed that any such Innovations and Works for Hire were Battelle's "sole and exclusive property" and he "assign[ed] to BEA all of [his] right, title, and interest therein."  *Id.* The agreement says that "'Employment' includes employment for hourly wages or salary." *Id.* ¶ 2.

## 2.    Thuen's Leave of Absence

As noted, by the time Thuen marketed Visdom, he was not an active Battelle employee.  He was on unpaid leave and was not receiving any wages or salary.  But

Thuen had not terminated his employment with Battelle either.  Battelle gives employees who intend to pursue spin-off activities a choice – they can either terminate their employment or take a leave of absence.  *See Acknowledgement and Understanding [of] Provisions of Professional Leave of Absence Policy*, Dkt. 28-4.  Employees who choose leave can retain some company benefits and, further – unlike employees who choose termination – their professional leave time "is counted in the computation of recognized service credit and the calculation of Retirement Plan benefits (if applicable)."  *Id.*

Thuen chose to go on leave.  Battelle approved this request, and planned for Thuen to take a one-year leave, beginning in February 2013.  *See* Dkt 28-3.  While he was on leave, Battelle paid for 80% of Thuen's medical insurance, which is the same rate Battelle pays for active employees. Thuen also retained his employee, spouse, and dependant life insurance benefits.

As discussed below, a key dispute presented in this motion is whether Thuen remained employed by Battelle – within the meaning of his employment agreement – when he created Visdom.  In addition to arguing that the contractual language supports their position, the parties point to extrinsic evidence, including the following series of events connected with Thuen's leave:

**3.      Events Occurring Before Thuen's Leave**

In January 2012, roughly one year before he began his leave, Thuen filled out two forms: (1) a Disclosure of Potential Conflict of Interest, Dkt. 28-2, and (2) a Request for Approval of Outside Activities, Dkt. 28-1.  In the Disclosure, Thuen elaborated on his

plans to compete for the Sophia license:

> As one of the inventors of the Sophia Software product, I am partnering with the other Sophia Inventors and forming a spin-out company that will potentially bid on the commercialization of the Sophia product. This company will ha[ve] the single purpose of pursuing the commercialization license of Sophia. Formation and running of this company will not require any INL resources. Our spin-out company will not pursue revenue sources or other business opportunities until a decision has been made on the commercialization license of Sophia.

Dkt. 28-2, at 1.

Thuen described his plans similarly in his Request for Approval of Outside Activities. Dkt. 28-1 at 1. Within that form, he also answered "Yes" to each of these questions:

- Does the proposed activity have the potential to conflict with any other INL mission or activities?

- Does the proposed activity have the potential to compete with any other INL business interests?

- Does the proposed outside activity entail the use of any confidential, privileged, or unpublished information gained in the course of your INL employment?

*Id.* ¶ B.

A few months later, in April 2012, Thuen signed a Conflict of Interest Plan to facilitate his ability to bid on the Sophia license through his new company, defendant Southfork Security, Inc. *See Ex. E to Colson Aff.*, Dkt. 2-3 at 22-24; *see also Addendum to COI Plan, Ex. F. to Colson Aff.,* Dkt. 2-3, at 25-27.

In December 2013, several months after these forms were in place, Thuen had a telephone conversation about his impending leave of absence with Battelle employees

Stephanie Cook and Tom Moriarty.  Moriarty was Thuen's contact in BEA's Conflict of
Interest Office, and Cook was Battelle's Director of Technology-Based Economic
Development.  *Fourth Thuen Dec.*, Dkt. 43-2, ¶ 4.  Thuen says the December 2013 call
related to his efforts "to gain clarification on a potential issue of conflict" – specifically,
his "ability to conduct security assessment business, an activity that is in direct
competition with BEA."  *Id.*  During this conversation, Moriarty reportedly told Thuen
"that once on professional leave, it would not be a problem as conflict of interest no
longer applied because [Thuen] . . . . was fully dedicated to a different organization."  *Id.*

**4.     Events Occurring After Thuen Began His Leave**

Thuen began his leave in February 2013, roughly two months after he had this
telephone conversation with Moriarty and Cook.  Within a matter of days, Southfork
submitted a licensing proposal for Sophia.  In mid-April, 2013, however, Thuen sent an
email to Cook, saying that there was "a high likelihood" he would withdraw his bid for
the Sophia license.  He offered to have a "lessons learned" meeting to discuss the issue.
*April 15, 2013 email, Ex. C to Fourth Thuen Dec.*, Dkt. 43-5.  That meeting took place on
April 17, 2013 and included Thuen, Cook, and Battelle's Deputy Director of Technology
Deployment, Jason Stolworthy.  They "discussed problems with the spinoff process, why
Southfork was withdrawing its bid, and the future plans of Southfork, including turning . .
. [Thuen's] efforts into a product that competes with BEA's Sophie product."  *Fourth
Thuen Dec.,* Dkt. 43-2, ¶ 6.

The day after the lessons-learned meeting, Southfork withdrew from the

competitive process to license Sophia.  Afterward, on April 24, 2013, Thuen sought

Cook's input on an executive summary of Southfork's business.  One purpose of this

summary was to attract investors.  *See id.* ¶ 7; *Ex. E to Thuen Dec.,* Dkt. 43-7.  The

summary is a one-page document, which describes Southfork's business as "a 'hackers

for hire' company made up of cybersecurity researches that use the knowledge gained

breaking things [sic] to make defensive tools."  Dkt. 43-7.  The summary also indicates

that Visdom is a "defensive tool" that was "created as a successor to the Sophia project at

INL.  This project involved three years of development time and lessons learned.  We

received valuable feedback from customers and used that knowledge to create the 'next

generation' to better sold their problems and protect our nation[']s critical infrastructure."

*Id.*  The summary further reports that "Visdom will be available as an open source tool in

order to reach more potential customers."  *Id.*

Cook responded to Thuen's email on May 1, 2013, indicating that the team had

feedback.  *See May 1, 2013 email, Ex. F to Fourth Thuen Dec.*, Dkt. 43-8 ("Have

feedback on your executive summary & will get that to you week of may 13th").  At

around that same time, Southfork began promoting Visdom on its website. *See Kaczor*

*Dec.* ¶ 26, Dkt. 2-4.

**5.     Thuen's Termination & The Lawsuit**

Meanwhile, back at the lab, Battelle decided to have its investigator, Michael

Colson, monitor Southfork's website.  *See Colson Dec.* ¶ 27, Dkt. 2-3.  Colson says that

on May 20, 2013, he noticed a new section of the website promoting Visdom.

Shortly thereafter, on June 28, 2013, Battelle fired Thuen for violating company policies and procedures, including "violation of written conflicts of interest policy, standards of conduct and business ethics, cyber security procedure, controlled unclassified information program, and the policy on use of laboratory assets . . . ." *Id.* ¶ 32.

On July 18, 2013 – a few weeks after he was fired – Thuen placed Visdom's source code on github.com.  Thuen says github.com is well known among computer programmers and is among the most popular internet repositories for open-source software.  *Id.*

In October 2013, Battelle sued Thuen and Southfork, alleging eight claims:  (1) copyright infringement; (2) trade secret misappropriation; (3) breach of contract; (4) tortious interference with prospective economic advantage; (5) unfair competition; (6) conversion; (7) breach of the implied covenant of good faith and fair dealing; and (8) unjust enrichment.  Battelle seeks summary judgment on its third claim for breach of contract and its seventh claim for breach of the implied covenant of good faith and fair dealing.

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources."  *Id*. at 327.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).  There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case."  *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings.  *Id.* at 255.  Direct testimony of the non-movant must be believed, however implausible.  *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999).  On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence.  *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The Court must be "guided by the substantive evidentiary standards that apply to the case."  *Liberty Lobby*, 477 U.S. at 255.  If a claim requires clear and convincing evidence, the question on summary judgment is whether a reasonable jury could conclude that clear and convincing evidence supports the claim.  *Id*.

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).  To carry this burden, if the nonmoving party bears the burden of

persuasion at trial, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Deveraux,* 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex,* 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

## ANALYSIS

### 1.    Battelle's Third Claim for Relief – Breach of Contract

Battelle says it is entitled to judgment as a matter of law on its breach-of-contract claim because Thuen created Visdom while he was a Battelle employee. As noted above, Thuen's employment agreement obligates him to assign "innovations" and "works for hire" to Battelle during the period of his employment.

The question is whether Thuen remained bound by the terms of his employment

agreement while he was on leave.  The contract itself does not speak directly to this issue; it does not mention leaves of absence.  Rather, regarding innovations and works for hire, it says only that such works created during Thuen's "period of employment" belong to Battelle.  *See  Emplmt. Agmt.*, Dkt. 2-3, § 7.

In opposing Battelle's motion, defendants say they are entitled to summary judgment on this claim.  Defendants point to two undisputed facts:  First, the employment agreement provides that employment "includes employment for hourly wages or for salary."  *Emplmt. Agmt.*, Dkt. 2-3, § 2.  Second, Thuen did not receive hourly wages or salary during his leave of absence.  Thus, defendants conclude that the time Thuen spent on leave cannot be included within his "period of employment" at Battelle.

The problem with Thuen's argument is that the plain, ordinary meaning of the word "includes" is not necessarily restrictive or limiting.  In other words, just because the parties agreed that the phrase "employment" includes "employment for hourly wages or salary," this does not also show that they meant to exclude other categories of individuals – such as those serving out a planned, one-year leave of absence.  Black's Law Dictionary explains that the term "include" means "[t]o contain as part of something," *Black's Law Dictionary* (9th ed. 2009).  This logically means that "employment" could include something in addition to "employment for hourly wages or salary."  Dkt. 2-3; *see generally* 11 Williston on Contracts § 30:10 (4th ed.) (appropriate to look to dictionary definition when determining the ordinary meaning of a word or phrase).

This conclusion is bolstered by the fact that the "Definitions" sections of Thuen's

employment agreement uses the word "means" to define other terms, but the less

restrictive term "includes" for the term "employment."  In full, the "Definitions" section

of the agreement mentions just three terms.  It reads as follows:

> "BEA" *means* Battelle Energy Alliance, LLC.  "Client" *means* any person or entity, including the United States Government, for whom or for which BEA or Employee obtains information.  "Employment" *includes* employment for hourly wages or salary.

Dkt. 2-3, at 1 (emphasis added).

Based on this language, Thuen is not entitled to judgment as a matter of law on the

contract claim.  *Cf. Lewin v. Mut. of Enumclaw Inc. Co.*, 87 Wash. App. 1023, 1997 WL

473233, at *2 (1997) (insurance contract using the work "includes" rather than "means"

to define the term accident meant that the term "encompasse[d] the common law and

common sense definitions of the term").

By the same token, however, the contract does not unambiguously say that

employees taking professional leaves of absence remain bound by the terms of their

employment agreement.  As a result, it is proper to consult extrinsic evidence to

determine the parties' intent.  As the Idaho Supreme Court has explained, "Unless it is

clear from a contract that the document contains every least infinite particular that was

intended by the parties to be included, parol evidence must be available as a tool for the

court to use in determining the actual intent of the parties."  *White v. Rehn*, 644 P.2d 323,

327 (Idaho 1982).

Battelle points to the circumstances surrounding Thuen's leave of absence to

demonstrate that the parties intended for employees on leave of absence to remain bound

by the terms of their employment agreement.  *See generally Permann v. Nationwide Ins. Co.*, 697 P.2d 1206, 1210 (Idaho Ct. App. 1985) ("subsequent conduct or communication may be considered in resolving an ambiguity if, but only if, it reflects an understanding shared by the parties.").  In particular, Battelle focuses on the fact that Thuen maintained health and life insurance benefits when he was on leave.  But that isn't conclusive because if Thuen had chosen to terminate his employment, rather than take a leave, he still could have potentially retained coverage under Battelle's medical plan for up to one year.  The leave policy states:

> Employees who wish to pursue entrepreneurial spin-off activities and choose to terminate their employment instead of taking Professional Leave may be provided coverage under the INL medical plan at active employee rates for up to one year following termination.

*Leave Policy*, Dkt. 28-4, at 2.

Still, though, employees taking leaves of absence received benefits terminated employees did not.  As stated above, the time spent on leave counted as service with Battelle for purposes of calculating retirement benefits, vacation and sick time and severance pay in the event of a layoff.  *Id.* ¶ 10.  Additionally, Battelle says that when employees on leave return to active employment, they do not need a new employment agreement.  *See Pickett Dec.*, Dkt. 28, ¶ 11.

Battelle also points to the April 2012 Conflict of Interest Plan.  Within that plan, Thuen acknowledged that he had responsibilities both under the Conflict-of-Interest Plan and his employment agreement.  *See* Dkt. 2-3, at 2.  The relevant language reads:

> Without limitation on his responsibilities set forth above [in the

Conflict-of-Interest Plan] *or those owed under his at will contract with BEA*, the developer shall not: (1) at any time during the period of his employment at BEA act in a manner or place himself in a circumstance that may impair his ability to impartially act in the best interest of BEA; …

Dkt. 2-3, at 23, 27 (emphasis added).  Battelle argues that this language conclusively establishes that Thuen remained bound by his employment agreement after he began his leave.  *See Supp. Br.*, Dkt. 49, at 2.

But the quoted language does not plainly say that.  It just acknowledges that Thuen had obligations under his employment agreement.  And that's not saying much, given that Thuen signed the plan while he was an active Battelle employee.

Granted, at that time, the parties anticipated that Thuen would be taking a leave of absence.  But acknowledging that Thuen would continue to have obligations under his employment agreement while on leave was a relatively benign thing to do; the employment agreement expressly states that some obligations continue after employment.

For example, section 6 of the employment agreement obligates Thuen to refrain from disclosing proprietary information "at any time during or after . . . [his] employment . . . ."  *Emplmt. Agmt.,* Dkt. 2-3, ¶ 6.  Likewise, section 8 obligates Thuen to sign papers and "otherwise assist" Battelle to obtain and sustain patents and copyrights "during or after . . . [his] employment."  *Id.* ¶ 8.

By contrast, the innovations clause – the one that obligates Thuen to assign innovations to Battelle – applies only "during the period of" Thuen's employment with the company.  *Id.* ¶ 8.  So, rather than clarifying things, this part of the plan just lead us

back to the original question:  Are employees taking unpaid leaves of absence completing a "period of their employment" with Battelle?

Battelle also argues that Thuen's June 2013 termination establishes that he was "employed" with Battelle up until that point in time.  As Battelle puts it, "BEA could not have 'terminated' Thuen's employment in June 2013 if he was not an employee." *Mot. Mem.*, Dkt. 41-2, at 6.  And Thuen submitted a declaration earlier in these proceedings stating, "Although I had been scheduled to return to work at Battelle on or about February 25, 2014, Battelle terminated the employment relationship on or about June 27, 2013." *Thuen Dec.*, Dkt. 16-1, ¶ 13.

But when viewed in context, the fact of Thuen's June 2013 termination does not conclusively establish that the parties intended for employees taking an unpaid leave of absence to remain bound by the innovations clause in the employment agreement.  Based on other facts, a reasonable juror could conclude that the parties did not intend for Thuen to remain bound by the innovations clause once he began his leave.

For example, when Battelle approved Thuen's leave, it did so based on Thuen's representation that he would be "fully dedicated" to Southfork, and Battelle prohibited Thuen from holding himself out as a Battelle employee during his leave.  *See Leave Agmt, Dkt*. 2-3, at 32 ("Your request is APPROVED with the following conditions:  . . . [¶¶ ]  2.  In conducting this outside activity, you may not hold yourself out as an employee or agent of BEA or the Idaho National Laboratory (INL) and you may not imply BEA, U.S. Government, or INL endorsement of your work at Southfork Security,

Inc. or otherwise without prior approval of duly authorized BEA management.").

Additionally, the conversations Thuen had with Battelle employees just before he

went on leave favor defendants.  As noted above, Thuen says that in December 2012, he

had a telephone conversation with two Battelle employees – including Tom Moriarty,

who was his contact in Battelle's conflict of interest office – in an attempt to "gain

clarification on a potential issue of conflict."  *Thuen Dec.,* Dkt. 43-2, ¶ 4.  Thuen claims

Moriarty told him that once he was on leave, he was no longer beholden to Battelle.  *Id.*

Additionally, even after Thuen decided to withdraw his Sophia offer, Battelle employees

were made aware of Thuen's plans to market Visdom and they made no objection.

On this factual record, the Court cannot grant summary judgment in either party's

favor.  The employment agreement is ambiguous as to the disputed language and the

parol evidence yields conflicting inferences as to the parties' intentions.  As a result, a

jury will need to determine whether the contracting parties intended for Thuen to remain

bound by the terms of his employment contract – including the innovations clause –

while on unpaid leave of absence.  *See generally Miller v. Glen Miller Prods., Inc.*, 454

F.3d 975, 987 (9th Cir. 2006) ("where divergent ultimate inferences may reasonably be

drawn from the undisputed facts, summary judgment is improper").

Given this ruling, the Court need not address defendants' alternative argument

that, even assuming Thuen remained an employee during his leave, Battelle is not entitled

to Visdom code that was (1) written after Battelle terminated Thuen in late June 2013 or

(2) written by Visdom co-developer Kristopher Watts.  *See Resp.*, Dkt. 43, at 12.  The

Court will, however, address quasi-estoppel and laches.

### A.     Quasi-Estoppel

Defendants claim they are entitled to a trial on the contract claim because of their quasi-estoppel defense.  Quasi-estoppel "stands for the proposition that "'one cannot blow both hot and cold.'" *KTVB, Inc. v. Boise City*, 486 P.2d 992, 994 (Idaho 1971) (quoting *Godoy v. Hawaii*, 354 P.2d 78 (Haw. 1960).  The elements of the defense are that "(1) the offending party took a different position than his or her original position, and (2) either (a) the offending party gained an advantage or caused a disadvantage to the other party; (b) the other party was induced to change positions; or (c) it would be unconscionable to permit the offending party to maintain an inconsistent position from one he or she has already derived a benefit or acquiesced in." *Vawter v. United Parcel Serv., Inc.*, ___ P.3d ___, 2014 WL 497437, at *7 (Idaho Feb. 7, 2014) (citation omitted). As a general rule, unless the facts are undisputed or only one reasonable inference can be drawn from them, the trier of fact must decide whether estoppel has been established. *See generally* 28 Am. Jur. 2d *Estoppel and Waiver* § 173.

Here, defendants point to Thuen's mid-April 2013 interactions with Battelle employees Jason Stolworthy and Stephanie Cook.  At around this time – and before he spent substantial time continuing to develop Visdom – Thuen told Cook and Stolworthy that he was not going to attempt to license Sophia.  He also told them that he was going to develop his own competing product – Visdom.  Thuen says he received nothing but encouragement from these Battelle employees.  And, in fact, Cook had her executive

team review Southfork's pitch documents, which showed that Thuen was planning promote a product that would compete with Sophia.

Based on the new evidence related to the mid-April interactions (which was not presented at the preliminary injunction hearing), the Court concludes that a trier of fact must decide if the quasi-estoppel doctrine bars Battelle from pursuing its breach-of-contract claim against defendants.

Lastly, the Court is not persuaded by Battelle's argument that the quasi-estoppel defense necessarily fails because Thuen's written employment agreement could not be modified without a written agreement signed by Battelle's president. *See Reply,* Dkt. 48, at 11.  As Battelle puts it, "at the time he e-mailed Cook and purportedly received input from Stolworthy, Thuen had already assigned Visdom to BEA by contract." *Id.* at 9.

There are two problems with this argument.  First, it presumes that the innovations clause of the employment contract continued to bind Thuen after he began his leave.  For the reasons discussed above, that factual issue cannot be decided on summary judgment.

Second, Battelle does not cite any authority establishing that a contracting party is barred from asserting an equitable defense to enforcement of a contractual provision.  Put differently, even if the agreement unambiguously said Thuen would be bound by the innovations clause during his leave of absence, and it further said that the contract could not be modified absent a written agreement, Battelle has not established that defendants would be barred, as a matter of law, from asserting equitable defenses such as quasi-estoppel. *See generally Rule Sales & Serv., Inc. v. U.S. Bank Nat'l Ass'n*, 991 P.2d 857,

863 (Idaho Ct. App. 1999) ("It is the general common law rule in this country that an oral modification of a written contract may be enforceable, notwithstanding a clause prohibiting unwritten modifications, at least in circumstances where one party has relied upon the modification."); *Cf. Idaho Migrant Council, Inc. v. N.W. Mut. Life Ins. Co.*, 718 P.2d 1242, 1244 (Idaho Ct. App. 1986) ("We have found no reason why a clause requiring contract modifications be in writing . . . may not be waived.")

### B.      Laches

Defendants next contend that their laches defense prevents the Court from entering summary judgment in Battelle's favor.  They point out that Battelle learned Southfork was promoting Visdom on its website in May 2013, but did nothing until October 2013.

"Laches is an equitable defense that prevents a plaintiff, who 'with full knowledge of the facts, acquiesces in a transaction and sleeps upon his rights.'" *S. Pac. Co. v. Bogert*, 250 U.S. 483, 500 (1919) (McReynolds, J., dissenting) (citation omitted). Whether a party is guilty of laches is a question of fact.  *Huppert v. Wolford*, 420 P.2d 11, 18 (Idaho 1966). The decision to apply laches is committed to the sound discretion of the trial court.  *Quintana v. Quintana*, 802 P.2d 488, 491 (Idaho Ct. App. 1990).  The elements of laches are: "(1) defendant's invasion of plaintiff's rights; (2) delay in asserting plaintiff's rights, the plaintiff having had notice and an opportunity to institute a suit; (3) lack of knowledge by the defendant that plaintiff would assert his rights; and (4) injury or prejudice to the defendant in the event relief is accorded to plaintiff or the suit is not held to be barred."  *Henderson v. Smith*, 915 P.2d 6, 11 (Idaho 1996) (citation

omitted).  Because the doctrine of laches is founded in equity, in determining whether the doctrine applies, consideration must be given to all surrounding circumstances and acts of the parties. *Id.* The lapse of time alone is not controlling on whether laches applies. *Id.* Rather, "'[t]he defense of laches is more of a question of prejudice caused by delay than a question of length of delay.'"  *Quintana,* 802 P.2d at 491 (quoting the trial court).

Battelle's lead argument is that the alleged delay in this case – around five or six months – is miniscule in comparison with the applicable limitations periods of five years for the contract claims and three years for the copyright claims.[2]  In ruling on Battelle's motion for preliminary injunction, the Court was persuaded by this argument, concluding, that, on the record then before it, the doctrine of laches would not bar Battelle's contract claims.  *Oct. 29, 2013 Decision,* Dkt. 31, at 12.

But the record is different now.  Defendants have come forth with evidence indicating that the circumstances surrounding Battelle's delay may have prejudiced them. That evidence, which has already been discussed above, is that in mid-April 2013, Battelle employees learned that Thuen planned to promote Visdom.  They gave no indication that Thuen was prevented from doing this; to the contrary, they offered to give feedback on how he might improve his chances of getting third parties to invest in Southfork and Visdom.  *See Fourth Thuen Dec. ¶¶ 6-9;* Dkt. 43-2; *Exs. C-F thereto.*

On this expanded factual record, the reasonableness of Battelle's delay in asserting its claims, and any resulting prejudice, is a more difficult question.  Battelle says that

---

[2] The Court assumes, without deciding, that these are the correct limitations periods.  Battelle cited these periods in its reply brief.  *See Reply*, Dkt. 48, at 6.

during the five or six months at issue, it was gathering facts and preparing a complex lawsuit and a motion for preliminary injunction. Battelle also points out that Thuen had agreed to submit a formal request for approval of outside activities if he decided to do anything other than attempt to get the Sophia license. Under these circumstances, Battelle says it acted with all reasonable speed.

But there are no fixed temporal boundaries on what is a "reasonable" or "unreasonable" delay. As one court has explained, "The period of time that constitutes an 'unreasonable delay' can range from one month to many years. The length of the delay is less important than the reasons for it." *IAC/Interactivecorp v. O'Brien*, 26 A.3d 174, 177 (Del. 2011). And in unusual cases, laches may apply even when claims are brought within the statutory limitations period. *See, e.g., Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 954 (9th Cir. 2001) ("we reject McClory's argument that laches may never bar a claim for infringement brought within the statute of limitations"). So the focus, really, is not on the sheer amount of time, but on the reasons why Battelle waited roughly five months to assert its claims and the prejudice that delay may have caused. After all, "'laches is not like limitation, a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced – an inequity founded upon some change in the condition or relations of the property or parties.'" *Id.* at 955 (quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946)).

Battelle also argues that laches cannot apply because Thuen engaged in willful copyright infringement. *See Reply*, Dkt. 41, at 8 (citing *Evergreen Safety Council v. RSA*

*Network, Inc.*, 697 F.3d 1221, 1228 (9th Cir. 2012).  But at this stage, there has been no finding that defendants infringed Battelle's copyright – much less that they did so willfully.  *See Oct. 29, 2013 Decision,* Dkt. 31, at 12 ("the Court finds the record inconclusive as to the copyright infringement claim").

Under these circumstances, the Court will deny Battelle's motion for summary judgment of the contract claims.

**3.      Battelle's Seventh Claim for Relief – Breach of the Implied Covenant of Good Faith & Fair Dealing**

The Court will also deny Battelle's motion for summary judgment on its claim for breach of the implied covenant of good faith and fair dealing.

In Idaho, the covenant of good faith and fair dealing is violated when "action by either party ... violates, nullifies or significantly impairs any benefit of the . . . contract . . . ." *Metcalf v. Intermountain Gas Co.*, 778 P.2d 744, 749 (Idaho 1989), *modified by Sorensen v. Comm Tek, Inc.,* 799 P.2d 70 (Idaho 1990). The covenant requires "that the parties perform in good faith the obligations imposed by their agreement." *Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.*, 824 P.2d 841, 863 (Idaho 1991).  An objective standard of reasonableness is to be applied in judging whether a party breached the implied covenant. *Jenkins v. Boise Cascade Corp.*, 108 P.3d 380, 390 (Idaho 2005) ("[T]he covenant is an objective determination of whether the parties have acted in good faith in terms of enforcing the contractual provisions.").

On the current factual record, the Court cannot decide, as a matter of law, that Thuen has nullified or significantly impaired Battelle's rights in the employment contract.

**MEMORANDUM DECISION AND ORDER - 22**

Summary judgment is thus inappropriate.

The Court is not, however, persuaded by defendants' argument that this claim fails as a matter of law because "[e]xpress terms of a contract may not be overridden by those implied from the covenant of good faith and fair dealing." *Opp.*, 43, at 10 (quoting *Huyett v. Idaho State Univ.*, 104 P.3d 946, 952 (Idaho 2004)).  This argument derives from Thuen's argument that the contractual definition of employment necessarily excludes Thuen, given that he was not being paid wages or a salary during his leave.  As noted above, the Court concluded that a jury must determine the parties' intent on this point.

## 4.        Copyright Law – The Work-For-Hire Doctrine

Battelle says that in addition to its contractual right to Visdom, the Copyright Act's "work made for hire" provision, 17 U.S.C. § 101, establishes ownership.  *See Mot. Mem.*, Dkt. 41-2, at 11.  As defendants have pointed out, however, Battelle has not alleged a work-for-hire claim in its complaint.  Additionally, Battelle did not address two of the three prongs the Ninth Circuit examines when determining whether something is a work for hire under the Copyright Act.  *See U.S. Auto Parts Network, Inc. v. Parts Geek, LLC,* 692 F.3d 1009, 1015 (9th Cir. 2012) (adopting three-prong test).  Under this three-prong test, a work satisfies the definition if: (1) the works is of the kind the employee is employed to perform; (2) the work occurs "substantially within the authorized time and space limits; and (3) the work is actuated, at least in part, by a purpose to serve the [employer]."  *Id.*

Even assuming Thuen was a Battelle employee, he argues that the second and

third prongs are not satisfied.  Battelle had no reply to this.  The Court thus concludes that the work-for-hire argument has been abandoned for purposes of this motion.

**5.     Permanent Injunction**

The Court will deny Battelle's request for a permanent injunction at this stage of the proceedings.  As Battelle recognizes, the Court cannot issue a permanent injunction unless the moving party first demonstrates actual success on the merits, not just a likelihood of success.  *See, e.g., Avery Dennison Corp. v. Sumpton,* 189 F.3d 868, 881 (9th Cir. 1999).

**ORDER**

**IT IS ORDERED THAT:**

**(1)** Battelle's Motion for Summary Judgment and for Permanent Injunction (Dkt. 41) is **DENIED.**

**(2)** Defendants' Motion for Leave to File a Supplemental Memorandum (Dkt. 53) is **DENIED.**

DATED: March 12, 2014

B. Lynn Winmill
Chief Judge
United States District Court

**MEMORANDUM DECISION AND ORDER - 24**